233582, 233613, Celestia Chapman v. Brentlinger Enterprises. Oral argument not to exceed 15 minutes per side. Mr. Starling for the Plaintiff Appellant Cross Appellee. Good morning, your honors. May it please the court. As the clerk noted, my name is Jason Starling. I represent Celestia Chapman, who is the Plaintiff Appellant Cross Appellee. I want to start by reserving three minutes for rebuttal, if that would be fine.  Thank you. Now, I don't think there is any dispute in this case that Celestia Chapman was wronged. She was fired because her sister was dying of cancer. And then after she was fired, her employer told the State Unemployment Agency something that was false to deny her unemployment benefits. It said she had quit, was a no-show and a no-call. So she had to fight for those benefits just to get the social insurance that compensates her for losing a job. She then was denied COBRA, which caused her to dangerously delay her own cancer treatments. And then finally, when she dared to hire me as her lawyer, and I sent a letter to the company, stating that we were going to bring an FMA lawsuit, she got threatened with sanctions. Sanctions that if the district court ever exercised them, would probably bankrupt her as an individual. Now, I'm going to tell this court something right off the bat that a plaintiff's attorney told me a long time ago, which is, there's a claim in there somewhere for that type of conduct. And I think, quite frankly, the easiest claim to start with is probably Count 1 for FMLA interference. And I think counterintuitively, even though it's an issue of first impression on the in loco parentis provision, I think it is a fairly easy, straightforward claim here, because the district court decided on very narrow grounds. It looked at the interpretation of 29 U.S.C. 261112B, which is what the FMLA defines as son or daughter. And in this case, we're claiming an in loco parentis parent-child relationship. So your client is standing as a parent to her sister who's terminally ill. That is exactly right, Your Honor. And the district court says, well, that can't work because that kind of quasi-parental relationship doesn't start when her sister is a child. That's district court's reasoning, right? I think that's exactly right, and I think it's subdivided into two holdings. So here's precisely what I read the district court is holding. The first holding on that was that the ‑‑ so first of all, let me back up. So 261112B defines son or daughter as someone who is 18 years of age or older and incapable of self-care due to a physical or mental disability. The district court held that that physical or mental disability has to arise during childhood and then continued into adulthood. I think that's obviously and plainly wrong. First of all, there's nothing in the plain language of the FMLA that says that. Second of all, there's actually a FMLA opinion letter, I think it's 2013-1, directly on point which refutes that. And actually, the Department of Labor went through the legislative history of the FMLA and made it pretty clear that it is going to cover a situation when, say, I think they gave the example of a 26-year-old who was paralyzed from a football accident or something along those lines and needed around‑the‑clock care from a parent. So in that case, the disability arose during adulthood and there's obviously a need to care for that son or daughter. So that's step one. The second holding, though, is that the district court said the in loco parentis relationship has to arise during minority. And I also think that's definitely wrong. So the court's thinking all this stuff has to happen in childhood. And I totally get your point as to the court's reasoning. I don't know if this is your easiest claim. I mean, you know, you said it was. But, I mean, your client still has to be standing in the position of a parent toward, and not just a caretaker and not just a loving relative, but a parent, toward her ailing sister. And that's where I kind of have my doubts. I mean, this is a relatively short‑term situation and her other sister is helping out sometimes. So explain why your client was a parent. Sure. I'll take that in two parts. I first want to respond to what the court said about a relatively short period of time. One of the cases that we cite in our brief, I think it's the Dillon case, said that the FMLA in its plain language, regulations, interpreting guidance, says nothing about the length of time that there must be for an in loco parentis relationship to arise. Could be a week, could be a month, could be a year. And certainly if we're talking about whether there's genuine issues of material effect, maybe that's a factor for the jury to consider. So maybe when you're sitting there as a court deciding whether there's an issue of fact, that may be one thing that goes the other way. It certainly, in my mind, is not dispositive. There's nothing in the FMLA that says it's dispositive. Could your client be in loco parentis for her sister and another person such as the other sister or brother be in loco parentis as well at the same time? That's a very good question, Your Honor. I think that absolutely, yes. And here's why. Because after all, people do have two parents often. That's exactly right. And I don't think the sex of the parents even matters, quite frankly, in this day and age. So if it was another sister, it was another brother, it doesn't matter. And additionally, there's nothing in the FMLA, as I read it, either in the plain language, the case law, the regulations, that precludes multiple in loco parentis relationships. So I think your point, Judge Moore, is a very fair one and very accurate. So going back to Judge Kethley's question, what facts establish the in loco parentis relationship? We took great pains in our brief, and I think specifically if you look at our original brief and reply brief, we went through all the things that Celestia Chadman did for her sister. This was more than a sister-sister relationship. Celestia described in her declaration, I'd encourage the court to read her declaration that we attached to our summary judgment briefing, because it went into detail on the types of things that Celestia did for her sister. So Celestia's sister was completely bedridden. She could do nothing for herself. The terminal cancer was eating away at her. There is no way for her to care for herself, and she needed somebody to care for her, and she did not want to go into a hospice and die in a hospital or some other facility. But as I understand, your opponents have put in some evidence suggesting that your client was not there all the time and was in another state during these last few weeks of the sister's life. What do we do with that, if that's true? I actually don't think that's accurate, so let me walk through the timeline for the court. So before Celestia's sister Sharon became so ill that she couldn't take care of herself at all, Celestia would go down to Kentucky and visit her sister and assist on her two days off per week. There was a point in time, I believe it was in the middle of June, when she got a call from her sister's daughter who said, look, you've got to come back. Sharon's too ill. She can't do anything for herself. So at that point, Celestia remained full-time in Kentucky with her sister Sharon. And that, I believe, was for half of a month. And then the only time when her other sister came in and helped, I forget her name off the top of my head, but she came in and assisted at the end because Celestia's being told by her employer, Brentlinger Enterprises, you better get back here. You're not FMLA eligible. If you don't get back here, you're going to be fired. So what she did is, in order to arrange this alternative schedule, she had to have her other sister come and assist as well. So the reason why the other sister came in and assisted Celestia with Sharon was because of her employer's demands on her. Had those demands not been made, had the FMLA leave been granted, it would have been solely Celestia taking care of Sharon. I hope that answers the court's question. But also, let me go back to the types of things that Judge Kethledge brought up. When you look at what Celestia did, her sister, the cancer was eating her alive. She would soil her own adult diapers. So Celestia would clean her. She'd take off the diapers. She'd walk her to the bathroom. She'd carry her. She spent all her extra money taking care of her sister. She bought the toiletries. She bought the household goods. She provided care and comfort. She rocked her sister. She sung her songs. She told her about the good times in her life and tried to remain positive with her. She literally did everything that a parent would do to a child. And even their other siblings agreed when they were deposed in this case. They said, it wasn't so much as a parent-child, but a parent-baby. At least a child could do some things for itself. A baby can't, and Sharon could not. Now, I think the point that my friend on the other side was trying to make about that is, well, where's the bright line here? And we talked about that in our brief. I mean, I think it takes a special kind of person to do what Celestia did for her sister. I mean, if you look at who Sharon had available to her to care for her, you know, her father was passed. Her mother was too old and didn't drive and couldn't care for her. Her own daughter didn't want to do it because it was too much work. Obviously, her estranged ex-husband didn't care and wasn't going to do it. And the other siblings couldn't do it because it was too much time and attention, and they lived elsewhere and had their own families. So it fell on Celestia, and quite frankly, that was what Sharon wanted. And if the touchstone of an in loco parentis relationship is intent, certainly that intent was there. What you describe is, you know, a really beautiful thing that a sister is doing here. It's describing a very difficult amount of tasks that many caretakers undergo when somebody, as the statute says, cannot care for themselves, even in the most basic ways. Are you asking us then to say that any time somebody takes on this caretaking, this really full-time caretaking role for someone who can't take care of themselves, that they get FMLA leave? No, not quite. And here's how I would distinguish it. So there's obviously a difference between, say, personal care, between family members or between people who form this personal connection, and do it out of gratuity and love, right? I'm not talking about professional caregivers or things like that. You don't need leave for your job when your job is to do it. But in terms of, you know, the FMLA seems to not be tied to biological relationships. It's very clear about that. It could be a very close friend. It could be a nephew. If somebody takes on, for a short period of time, maybe this end-of-life care or maybe it's like a post-surgery care. We can think about times post-surgery when people aren't able to walk to the bathroom themselves and things like that. Again, very, very important and very hard work. I'm not demeaning it in any way, but I'm trying to figure out the scope of the rule that you would have us play. Sure. So, yes, I would have you hold that the in loco parentis provision applies there if it meets the requirements of the in loco parentis. And I don't mean to say that in a circular fashion. What I mean is that if you look at our brief, we talk about some of the ways in which this is cabined and is not so expansive or wouldn't lead to massive FMLA coverage in all circumstances. So, for instance, to start you have to have intent, right? The person who is the subject who needs care has to intend to form the in loco parentis relationship. Here there's no dispute about intent. Sharon asked for it. She asked specifically Celestia, and Celestia agreed. Beyond that, there are four factors. Actually, I would say there are four elements that are talked about in one of the DOL opinion letters where you have to have, for instance, a disability that qualifies under the ADA. You have to have a serious health condition that requires care. And then additionally, beyond that, when you're looking at in loco parentis, there are multiple factors about how much the person is doing for them. So, hypothetically, could the in loco parentis apply if all those factors are met if the in loco parentis parent is taking care of a friend, not a relative in any way? My time's up. Yes, please. Yes, I think it could apply. And, again, I don't think in loco parentis is limited to family members, friends. Congress recognized with the FMLA, first of all, that life is difficult. Why do they have the words in 2612 and 2611, son, daughter, spouse, parent, if anybody could qualify? Because they also have the words in loco parentis. So one of the things that I want to make a clear point on is that I know my opposing counsel here is the first four or five of those, the explicit family members that are entitled to FMLA leave. That's obviously the plain language, but so is in loco parentis. And in loco parentis has a specific meaning. I've talked about it in our briefs about how it can include aunts, nieces, adopted children, family relations that are close. What matters to form the in loco parentis is not the formal title we give the two relations to the people, but the underlying facts about whether they form that relationship, whether they meet the necessary criteria, whether there is that level of care, attention, devotion, and intent that Celestia had with Sharon. Thank you. Thank you. May it please the Court, Marion Little for the appellee and cross-appellant. The fact scenario described by my friend, of course, is deserving of admiration. We've all been in similar situations. We've all cared in some degree for family members. But one of the things we also have to look at is from the perspective of the employer. And in this particular case, the plaintiff had been away from the company for nearly a month. She had a documented history of failing to give them timely notice when she was not going to be present. On the day she was terminated, she did not give timely notice. Now, she has an ex- Is there a fact question on that? There is not, Your Honor. She has specifically stated in her complaint, which is a judicial admission, that, and this is that paragraph, I'll get it for you in a moment here. She specifically stated in her complaint that she was not available to arrive at work on that date in June, and that she attempted to give notice. She then twice in declarations or affidavits submitted to the district court, stated that she intended or attempted to give notice on the day in question. In each case, she explained that she failed to do so because there had been an issue with the ability of the text message to transmit. So there's no dispute there was an expectation by her and the company that she would give notice. There is no dispute, according to her, that she tried to give that notice. And there's no dispute that that notice was not timely delivered. And so that goes- She was, what, an hour or two late from the time that they agreed she should come back from taking care of her sister? It was probably, it was in the morning time when she finally established contact with the employer, Your Honor. After, again, being gone for a month. And after, this was the schedule that she had- Gone for a month with permission to be gone for the month, right? Yes. They accommodated her for that month. And then there was an agreement that she was going to return. And this would be her schedule. And this was the time she was supposed to arrive. And, again, you can look at the complaint. The specific paragraphs I was looking for was paragraphs 47 and 48, which says that she gave the notice. And it was in the summary judgment motion that she conceded that the notice that she attempted to provide failed to be delivered. And that's something we have to consider from the employer's perspective. The other thing we have to consider from the employer's perspective, in the course of no less than 45 days, we tried to have her rehired five times. What's the relevance of that to the issues before us right now? Well, I think we all are impacted by a particular set of facts. So if we're going to consider the facts that counsel would have you consider, I think we have to consider it in its entirety. One issue we have before us involves a retaliation claim. Yes, sir. And our court has a relatively recent decision, Feiger and Feiger, where we say retaliation for requesting FMLA leave is actionable. And I'm not really seeing where the district court – she makes that claim here. And I don't see where the district court addressed that. Am I missing something? I think the district court addressed that, Your Honor, in the context of a reference to causation. The district court judge was looking at direct and indirect retaliation. And as he approached that particular subject, he found no evidence direct. And as to the issue of indirect, he then concluded – I understand there's a McMillan case that he didn't cite. But the McMillan decision says – Just, if you may, please finish your explanation as to how the district court actually adjudicated this claim. Because I'm struggling to see that. The way that the district court addressed the interference claim, Your Honor, was to conclude that first, on the direct claim, that she was – to the extent she was fired for participating in a non-FMLA-protected activity, she cannot show she was fired in retaliation for asserting those rights if they don't exist in the first place. And as to the indirect claim, Your Honor, he said that even if requesting leave is a protected activity, which the court said it was, she was not terminated for requesting. She was terminated because she was gone. She had left. Which is very – I'm sorry? Just so I could look it up, what page? I can – If you turn to page 10 of 25, that's where the discussion's at. I don't want to take up more of your time. Sure. But his analysis, although not focusing on the McMillan case, is perfectly consistent with it. Because McMillan keeps intact the proposition that demand for leave is protected even if the leave request was not available. That is the demand. But the court also kept intact that when the leave is actually taken, but there was no protection, which was sort of the old law or the propositions adopted by this court on prior occasions, that there was no protection. Here, there was not an attempt that – because the attempt then migrated, as the concurrence of McMillan said, to the employee that had actually taken the leave. And once the employee takes a leave, it's no longer an attempt or a request for leave. It's that you've actually taken the leave. And so I appreciate the McMillan court's further clarity in the law on this particular point. But if you apply McMillan, and as explained by the concurrence, the district court judge is correct because there was no FMLA protection available here in the first instance at the time she was terminated. And she was terminated for not being at work. Now, one of the other items is we've now talked about what was the factual framework that was presented to the employer. And one of the dangers that's being proposed by my friend on the other aisle is that creating a subjective test that no employer would be able to have any factors to assess whether or not someone was in fact standing that capacity. But we don't have to go through adopting subjective tests because we're not riding with a clean slate. The Sixth Circuit on several occasions has said that FMLA protection is not available to everyone. There's a certain number of enumerated categories that have been established by Congress. But why shouldn't it be available in this in loco parentis situation? Well, for the reasons that I think Your Honor may have mentioned, that when we look at the definitions of who is a son or daughter under 2611.12, the term child is always a precondition under the statute. And I don't agree that the... But it can be a child of an in loco parentis relationship, right? That's correct. Right, and child is defined to be either someone who is under 18 years old or somebody who is older than 18 years old and incapable of self-care because of a mental or physical disability. That's correct. A child doesn't have to be a little person. That's right, but you're measuring when were you a child? When did that relationship establish? That's the part the district court got right. Well, where is that in the statute? Well, it's what the district court relied upon when they looked at the Department of Labor regulations. Can I give you a hypothetical? Certainly. What do we do with a situation hypothetically? We have a brother and a sister, right? And the brother can't take care of themselves because of mental or physical disability, right? The kids grow up and the parents, biological parents, are taking care of the brother this whole time. Parents pass away, right? They're natural causes, right? Now the sister takes over those responsibilities. The sister was not in an in loco parentis relationship with the brother from being a minor, right? But now is the caretaker, full caretaker, maybe has full legal obligations, maybe has all sorts of powers of attorney, can consent for the person, is doing the exact same thing that the parents were doing. But the relationship didn't start as a minor. Can that person not get FMLA leave? They cannot. If we look at 29 CFR 825.122DE, which is the Department of Labor regulations, talks about that parental relationship has to be formed before the child reaches the age of majority. Where is that? That is 29 CFR 825.122DE. DE? Yes. So they're two separate sections? D3? I said I have DE. Maybe it's a typo when I typed it. D and E are two separate sections. Maybe it exists. But the point of those sections, Your Honor, is that that is consistent with the case law that has addressed these issues in the past, always focusing upon when was the relation created between someone who's going to stand in loco parentis status and the person who's being cared. That relationship has to be established when the person who's being cared was actually a child. So that's something that the district court relied upon in looking to see how the Department of Labor has addressed this. And we also then have... Didn't our cases, like all the way back to 1947, like explicitly disclaim that loco parentis relationship had to start early, maybe thinking about when it started as a factor and thinking about whether there's a loco parentis relationship but that it's not conclusive. Well, I think the difference is those cases weren't interpreting a statute or regulation that had the precursor child in it. And here we do. So the child that is a reference in 2611.12 and 11, that is a distinguishing factor because we're looking to see what kind of position did Congress want to create. But the child can be over 18 and not able to take care of themselves. It doesn't have to be a biological child that you had since birth. No dispute about that. If you developed a relationship with a person under the age of 18 as a parent, either as a parent or in parentis loco, and you continue to care for that person, and that person has developed a severe situation, then that's going to be covered by FMLA. I'm having a hard time finding continuing care anywhere here. And, indeed, it seems to suggest that you could, if you're the employee who's taking care of a loco parentis parent, maybe there was a gap in time. Maybe people took care of you as you were a young person, but maybe there was a gap. It's not like you were caring for them the whole time. Then loco parentis parent gets sick. Then you take care of them. Then you get FMLA leave. I don't think continual care is a problem. I don't mean to suggest that, Your Honor, and I apologize if I misstated. It's not intended to say it had to be continuous care. It's just that the relationship had to be established before the person who was ultimately cared, whether they're under 18 or over the age of 18, the relationship was established. So this would, going back to your hypothetical, the fact that one of my brothers becomes deathly ill and I start to care for him now that my parents have passed, doesn't make me a parent under the FMLA Act, even if I'm caring them as if a parent did. And taking the court's hypothetical, can you imagine a situation in which someone would not be covered by FMLA because if they have a sincere interest in caring for a member of their family, under the court's hypothetical, they would be labeled a parent because the maternal parent is passed away, and that would be an unlimited application of FMLA is where we would end up. I think your friend on the other side would say, well, no, it's not unlimited. It requires somebody to actually take care of someone as the parent and show that they have that relationship. Now, I take your point that there could be applicability and difficulties for employers trying to figure that out. I take that point, but I don't think that your opponent is arguing for an unlimited definition of a local parent as to just any caretaking. But that would be the practical application, right? When we're talking what's going to happen in practice, we know that it opens up a floodgate in which there's no one who wouldn't qualify as long as they testify they have a sincere interest in taking care of a loved one. If they say that, who would not be covered? The answer is no one. Everyone would be covered. If they're covered, though, what does the FMLA provide? It provides for 12 weeks of unpaid leave a year, correct? That's correct, Your Honor. If I may, I'd like to ask you real quick about this disability discrimination claim by association. My question there is why hasn't the plaintiff established a genuine issue of material fact for that claim simply with her testimony that her supervisor, I forget her name, begins with a B, Benascot or something like that? That's a con. She allegedly tells the plaintiff, you have to choose between your sister and your job. Why doesn't that create a genuine issue as to whether there's an adverse action against her because of her association with her sister who's disabled? Well, it's really because of the evidence. And as applied to the law, as it always is. There was no first obligation to accommodate under this particular theory. Second, she wasn't being terminated because she was inattentive at work. The record's undisputed, Your Honor. She was terminated because she was not at work. So that's it. She can say that they were trying to make me force make a decision, but the evidence is why were you terminated? The person who made the termination decision testified probably 20 times in her deposition because the question was asked over and over. She was terminated because she didn't give us the appropriate notice and appear at work. That was the explanation provided.  I mean, juries can reject testimony. Well, they certainly could, but it requires that there has to be some type of evidence contradicting it, at least in summary judgment. Fair. And here it's, I would submit to the court, undisputed that it's why she was terminated. Again, sympathetic facts. I'm not going to deny that, Your Honor, but we have to consider in the context of the employer's rights as well as what actually happened in terms of trying to rehire her. So thank you for your time this morning. How about that last point real quick? Do you have a response? On the rehiring point, Your Honor? No, on disability discrimination by association. Well, I think what you're articulating, Your Honor, is a genuine issue of material facts. I mean, when I went through in our brief and talked about that testimony and cited some other cases outside the circuit where we indicate that is direct evidence, quite frankly. Now, the other side may have a different story, and they do. And that's fine to present to a jury. We're not here conducting a bench trial on paper, okay? We're talking about whether there are issues of fact for trial. And I think the court is absolutely correct in saying that there are issues of fact, if that's what it's saying. I want to go through and address a few points by my opposing counsel. He first talked about perspective of the employer. We have to consider the perspective of the employer. Well, honestly, Congress already did that when it enacted the FMLA, and it put limitations on FMLA leave. Like, for instance, having 50 employees within a 75-mile radius, a limitation on 12 weeks. I think there's actually some case law from this court that says Congress determined that with the FMLA, it was appropriate to burden employers by providing 12 weeks of unpaid leave. So Congress has already considered the employer's concerns in this case about providing leave to Celestia Chapman. One of the other things I want to talk about is the past case law that my opposing counsel talked about. Honestly, there is no case that fits this fact pattern except the district court case of Crawford, which we cited in our brief. The other cases that my colleague was talking about were instances where the employee was claiming to be the in loco parentis child. That's not the claim here. The claim is that our client is the in loco parentis parent. Now, that's a critical distinction because as an in loco parentis child, that relationship is going to arise in the past, which is why you have that language of when I was a child. So, for instance, a grandparent who raised an employee in the past and had an in loco parentis relationship, that ceased at the point the employee became capable of performing their own life tasks in adulthood. Now, that's why the DOL refers to when the person was a child because as a in loco parentis child in the past, when you're in loco parentis child, that's the only time it's going to arise, is my point. So that immediately and easily distinguishes that case law. I also want to address something that my colleague said about the complaint. I don't think it's a judicial omission. As this court knows, complaints are not evidence. They don't go into trial. They're not presented to juries. There's no rule in this court that says if an affidavit contradicts a complaint, then it can't be used. Honestly, complaints are drafted by plaintiff's attorneys like myself. We're not perfect. We do the best we can, and honestly, they can be amended to conform to the evidence, as this court knows, under Rule 15. I last want to address the attempt to rehire. I don't know that that's properly before this court because the district court did not decide our cross motions for summary judgment on the 4BEOC unconditional rehire. I think the district court has to decide that in the first instance. But I will say from a practical standpoint, my time's up if I may finish. Yes, please. From a practical standpoint, I don't mean to employ a golden rule argument or oral argument, but put yourself in the position of the plaintiff for a moment. She's been fired because her sister was dying of cancer. She doesn't want to go back to that employer. I can't talk to her about this case without her crying at some point. Your time is up. Can I just ask you one more question? I'm sorry. I read, at least I think it could be one reading of the district court's decision, that it didn't see the plaintiff as properly raising the retaliation claim based on just requesting FMLA leave. If I disagree and think it was properly raised, would you suggest that this court send it back to the district court to address those claims in the first instance, or would that be something that this court should do? I think this court should do it. I think there's a distinction because if you look at, for instance, the affirmative defense, the district court didn't address it at all. As far as the other claims, the FMLA interference, FMLA retaliation and so forth, the district court addressed them, analyzed them, made its ruling. That gives this court the leeway to offer its ruling on a de novo review. So I think to answer your question, Judge Blomkatz, I think the court can address the FMLA retaliation if it disagrees. Now, I appreciate everybody's time this morning, and thank you very much. Thank you both for your argument. The case will be submitted.